

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-11-00013-CR

_____

TIMOTHY MALONE, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 159th Judicial District Court
Angelina County, Texas
Trial Court No. CR-29753

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

Ironically and sadly, Crystal Rita's party celebrating the completion of her criminal justice

degree resulted in two shootings, one fatal and one the subject of this appeal.

The festive atmosphere of Crystal's graduation party was shattered when drunken former

correctional officer Timothy Malone shot Crystal's boyfriend and killed another partygoer.   For

shooting the boyfriend, Malone was convicted by a jury of aggravated assault with a deadly

weapon, sentenced to five years' imprisonment, and assessed a $5,000.00 fine.   Malone's appeal

all centers on his claim of self-defense.   We affirm the trial court's judgment because

(1) sufficient evidence supports the rejection of Malone's self-defense claim, and (2) the jury

charge was proper on the two self-defense-negating issues of provocation and unlawfully carrying

a weapon.

*(1)      Sufficient Evidence Supports the Rejection of Malone's Self-Defense Claim*

The party took place at Crystal's Hudson, Texas, home.[1]   She invited friends, including

co-worker Malone, a correctional officer for the Texas Department of Corrections at the Wynne

Unit in Huntsville, Texas.   Although Malone lived approximately eighty miles[2] away in New

---

[1]Originally appealed to the Twelfth Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts.   *See* TEX. GOV'T CODE ANN. § 73.001 (West 2005).   We are unaware of any conflict between precedent of the Twelfth Court of Appeals and that of this Court on any relevant issue.   *See* TEX. R. APP. P. 41.3.

[2]Although the distance between the two cities is not included in the record, we may take judicial notice of the location of "cities, counties, boundaries, dimensions, and distances because geographical facts such as these are easily ascertainable and capable of verifiable certainty."   *Butts Retail, Inc. v. Diversifoods, Inc.*, 840 S.W.2d 770, 774 (Tex. App.—Beaumont 1992, writ denied).

Waverly, he accepted the party invitation. Crystal advised that there would be alcohol at the party, including her concocted "trash can punch," and promised Malone "a bed for him to sleep."

Malone arrived on a motorcycle, which he parked "real close" to the front door of Crystal's home. He delivered an open bottle of vodka to Crystal, who believed he had been drinking. Since he was spending the night at the home, Malone walked over to Crystal's live-in boyfriend, Joel Gresham, "said he had already been drinking a little bit," and gave Gresham the keys to the motorcycle "right off the bat" "so they'd be safe." Within Malone's sight, Gresham took the keys to his room and put them into his clothing cabinet "where they would be safe and away from everybody." The two returned to the party outside and socialized with others while drinking.

Crystal testified that Malone consumed two glasses of alcoholic punch, a shot of Patron, and several beers. While "it was still early," Crystal became nauseated and dizzy after consuming too much alcohol. She "stepped inside the house" to "cool down," but was "out for about an hour, hour and a half," until she was physically helped to the master bedroom where she lay down.

During the party, Malone asked Kenneth Lee Allsbrooks if someone could give him a ride to New Waverly. Allsbrooks, claiming he was "playing around," responded, "Yeah, I'll give you a ride back over there if you leave the motorcycle in the back of my truck with a title to it." According to Jordan Perkins, Malone took the comment seriously and "got a little agitated, a little mad." The conversation became heated. Perkins testified Malone "told [Allsbrooks] . . . a couple of words I'm not going to say in here. But he didn't want to talk to him." Malone said,

3

"Go on. Get out of my face" "I don't want him to talk to me. I don't trust him." Perkins "told [Allsbrooks] to walk off" and explained to Malone that they were joking and would not mind taking him home and unloading the motorcycle.

Gresham testified that Malone "was kind of getting talkative, starting to say that, yeah, 'They're going to take my motorcycle' and stuff like that, and he was talking back to them." Gresham believed that Malone "was kind of going overboard about what they were doing because they were just joking with him, that I could tell . . .. And I know when I overheard it, that Jordan was trying to explain that to him." Gresham told Perkins to "shut up. Told [Malone] to hush. 'You-all stop the conversation.'" Perkins also believed that Terry Adams "and Mr. Malone had a little fallout a little bit. [Adams'] wife, Stephanie, was getting dressed, changing clothes in her truck; and Mr. Malone asked if he could attend in the changing towards [Adams] with Stephanie." Adams "kind of upset him."

After these occurrences, Gresham escorted Malone to the room where he would be sleeping. Gresham testified that Malone grabbed another beer, even though he was "pretty drunk," and sat down on the bed. Michael Skates testified that he overheard a conversation where Allsbrooks jested he was going to make Malone "think that somebody was messing with his bike." Crystal testified, "I had heard the truck revving up outside. [Perkins] and his friend [Allsbrooks] had two trucks that's got big pipes on them. And they were having a revving-up contest." Gresham testified the two trucks, which were parked far away from the motorcycle, were much

4

louder than Malone's motorcycle.

Malone testified, "I got up. I removed my firearm from the holster . . . and I proceeded to the front door" because he believed someone was stealing his motorcycle. He admitted that he opened the front door and stated, "Who's messing with my f***ing bike?" Skates testified that, despite the profanity, the tone of the question was "[r]eal mellow." Andrew Cockrell, who was standing outside, observed that Malone "had the gun pointed downwards."

Gresham responded by "trying to let Malone know that his motorcycle keys were still in [the] cabinet . . . , and his bike was safe, that nobody's been messing with his bike." Perkins also "showed [Malone] that the bike has never been moved; no one's been over there near it." Malone "looked around" and confirmed "that there was obviously nobody on my bike. There was nobody near my bike." Nevertheless, the danger did not dissipate.

Gresham testified, "[Adams] asked [Malone] why he had a gun at the door" in a calm manner. This differed from Skates' testimony that Adams "dropped his beer that he had in his hand, walked up to Mr. Malone, and told him to put the damn gun down," and Cockrell's testimony that Adams "was a bit angry" when he told Malone to "[p]ut the MF gun away." Wanting Malone "gone from [the] house since he had a gun," Gresham told Malone he "was going to go get his key so he c[ould] leave." Gresham remained calm until he was blocked by Malone from entry into the house. Perkins related:

> [Gresham] walked up to him. Wanted to know what he was doing, why he
> pulled a gun. [Malone] told—put his hand in front of [Gresham], told [Gresham]

5

> he needed to back down the stairs.   [Gresham] backed down the stairs.
>     [Adams] came around, walked in front of [Gresham]; and he asked
> Mr. Malone why did he pull a gun, why does he have a gun at this party.
>     And Mr. Malone kept looking around, but with a hand in front of [Adams]
> and [Gresham], telling them that they're not going to come forward.

Skates testified Gresham did not shove, but "kind of forced his way into the house," while Adams told the group "[y]ou-all call the cops.   Get them out here.   I'm going to try to get him to put the gun down here."   Skates continued:

> As I stood here, Mr. Adams spoke several times without—without yelling, again, without yelling.   Had asked Malone to put the gun down.   He said no, he wanted his keys.   He had assured Malone that the keys . . . was going to be brought to him. Malone still didn't want to drop the gun.   Mr. Adams asked him, "Is the gun loaded?"   Malone said, "Yes, it is."   And I remember [Adams] reaching out for the gun, and that was when the first shot . . ..   And I watched [Adams] take that shot. Got his arm out.   Just went to rapid-fire.

Crystal testified Gresham was already retrieving Malone's keys "[a]t the time that [Adams] had actually asked [Malone] if the gun was loaded."   Gresham remembered that Adams "asked him again why he had the gun or if he was going to put it away . . ..   And a fire—I guess a first shot happened.   I don't know because I was walking past, and I turned around to see what was happening."   Then Malone shot Gresham, who was walking back with the motorcycle keys and a cell phone in hand.

Crystal stated, "The next thing I recall happening is [Gresham] falling down the stairs that goes into our bedroom.   He falls back.   And then Malone steps down the stairs . . ..   Well, he pointed the gun at me."   Gresham was "down on the ground . . . one hand was holding his leg . . .

6

the other hand was holding his keys telling Malone, 'Here. Take your keys. Take your keys. Go. Go. Get out of here.'" Crystal testified that she "hollered at him and said 'Malone, what are you doing?' And he looked at me and then he just walked out" in a manner that seemed "calm like nothing was bothering him." The police were called immediately.

Malone exited the house, and witnesses watched as he "rode off on his bike." Crystal followed Gresham's plea to rush to Adams. Crystal testified, "I slid into the bedroom. There was blood everywhere. [Adams] was on the floor. He was flopping around." She "immediately started covering bullet holes." Allsbrooks ran into the house and saw that Gresham "was on the bed holding his leg" where he had been shot. Allsbrooks also began putting pressure on Adams' wounds. Despite the group's efforts, Adams died.

Officer Ruben K. Kimball was dispatched to the disturbance at the home. On the way, he stopped to assist Malone, who had fallen off of his motorcycle after driving it into a ditch. Kimball spoke with a dispatcher before exiting his vehicle, realized that Malone was connected to the shootings at the home, and found Malone's weapon in the motorcycle's saddlebags. Kimball observed Malone "was acting in a very, I guess, carousing and jovial manner." Malone was arrested. While being placed in the police unit, Malone remembered asking Kimball the reason for his arrest. In a jailhouse recording, Malone stated to a visitor, "I got arrested. I didn't remember anything. It's all coming back in little flashes, little pictures." Malone was taken to the hospital on the night of his arrest. His blood-alcohol level was .184 at the time of testing.

7

In evaluating legal sufficiency of the evidence to prove the charged offense, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of aggravated assault of Gresham with a deadly weapon beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). Our rigorous legal sufficiency review focuses on the quality of the evidence presented. *Brooks*, 323 S.W.3d at 917 (Cochran, J., concurring). We examine legal sufficiency under the direction of *Brooks*, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); *see also Vega v. State*, 267 S.W.3d 912, 916 (Tex. Crim. App. 2008). Count two of Malone's indictment[3] alleges he "did then and there intentionally, knowingly, or recklessly cause bodily injury to Joel Gresham with a firearm, and the defendant did then and there use or exhibit a deadly weapon, to-wit: a firearm, during the commission of said assault."

---

[3]In count one, Malone was indicted for the murder of Adams. Following deadlock among the jury, the trial court declared a mistrial as to that charge.

Malone committed the offense of aggravated assault if he intentionally, knowingly, or recklessly caused bodily injury to Gresham and used or exhibited a deadly weapon during the assault. TEX. PENAL CODE ANN. §§ 22.01(a)(1), 22.02(a)(2) (West 2011). A deadly weapon is anything that, in the manner of its use or intended use, is capable of causing death or serious bodily injury. TEX. PENAL CODE ANN. § 1.07(a)(17)(B) (West 2011). It is undisputed that Malone shot Gresham with a deadly weapon causing serious bodily injury. The jury was free to find, based on the evidence presented, that Malone's act was done with the requisite intent.

Malone's argument, however, complains that the evidence was insufficient to support the jury's rejection of his self-defense claim. When a defendant asserts a claim of self-defense, the State has the ultimate burden of persuasion. *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003). The burden of persuasion does not require the production of evidence; it requires only that the State prove its case beyond a reasonable doubt. *Id*. at 594. When a jury finds a defendant guilty, there is an implicit finding against the defensive theory. *Id*. When reviewing the sufficiency of the evidence concerning the jury's rejection of self-defense, we look to whether any rational jury could have found against the defendant on the self-defense issue beyond a reasonable doubt. *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991); *Hernandez v. State*, 309 S.W.3d 661, 665 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd).

Malone testified in support of his claim of self-defense. According to Malone, the following occurred after he produced the gun at the doorstep:

9

[Gresham]'s saying, "Get back in the f[***]ing house." [Adams]'s saying, "Is that a gun? Do you have a gun?" They come up to me on the porch. [Adams] pushes me. I keep my hand out at arm's length, trying to keep them, you know, back a little bit, keep my gun faced down, pointed at the ground. He's pushing me back. He pushes me into the house. [Gresham] goes to the right, or my left. [Adams] goes to my right.

When Gresham went to retrieve Malone's keys, Malone was "feeling very vulnerable at this moment in time" because "they got me separated." Malone stated Adams was pushing him while he attempted to keep Adams "at arm's length." Malone testified Adams gave up.

He backed off. And [Gresham] came up at me . . .. And he said, "I'll kill you." And then he comes at me, but he keeps his left hand down at his side. And he's coming at me with his right arm. He's kind of pushing (demonstrating), you know, hitting me, hitting me, hitting me. And I'm trying to keep him—keep him back at arm's length . . .. Then [Gresham] swung at me. And at this point I knew he was—he was going to slap me; he was going to punch me, something. And I blocked. And then I struck him back.

I remember because I struck him right there in the shoulder. I think it knocked him off balance because he went back a couple of steps.

That's when [Adams] said, "You're dead" and he came at me. That's when he—he climbed on me—or jumped on me.

According to Malone, Adams said, "Give me the f[***]ing gun" and "You're dead." Malone described that Adams' "right hand was on my left shoulder . . .. And I'm thinking he's stabbing[4] me with something . . .. I was trying to get his arm off of me." "[Adams] gets his hand on the barrel of my gun . . .. Now I know I'm in trouble. He's starting to pull away. He's starting to pull the gun away from me . . .. I'm about to lose the gun. I'm losing my grip. It's sliding out."

---

[4]Malone testified, "I thought he had like a screwdriver or something." Nevertheless, it was undisputed that Adams and Gresham did not have any weapons during the shooting.

Malone testified he pulled the trigger and shot Adams at this time. Adams sustained eight gunshot wounds.[5]

When he "saw [Adams] fall back," Malone "heard steps coming up behind me." He turned and fired. The first shot missed, so he pulled the trigger again. Malone "saw an individual coming at me like this, like he was going to dive-tackle me." After shooting Gresham, Malone took his motorcycle keys from Gresham's hand and left. As a result of the alleged altercation, Malone testified he sustained a black eye, and "[p]retty much the whole left side of my face was swollen, and my shoulder was swollen." Malone's mother testified that, during her first visit with Malone while he was in jail, his "left eye was just humungous, red, puffy with a cut over it on the fatty part" and that Malone's eye was "swollen shut." She also claimed Malone "had a thing on this shoulder . . .. It was like dents, big dents in his shoulder . . .. One of them had a scratch in it."

Ashley Denby, who transported Malone to the hospital following his arrest, did not recall any injuries on Malone. Officer Jose Mantilla, who booked Malone into jail, did not see any injuries, and none were clearly indicated in Malone's photograph taken during the booking process. Malone told the nurse his pain rating was "zero." Staff Sergeant Jesus Guerrero, who booked Malone back into jail after hospital treatment, also testified that no injuries were present.

Although Cockrell heard "some fussing," "argument," and "foot steps . . . like, maybe somebody was being pushed," Malone's version of the altercation that led to the shooting was

---

[5]This fact alone placed Malone's claim of self-defense in serious jeopardy.

countered by several other witnesses. Gresham testified, "There was never a scuffle in my house," and that he did not use force or see anyone use force against Malone. According to Crystal, the conversation between Adams and Malone was "[b]asically, trying to get Malone to hand over the gun so things wouldn't exceed [sic] to another level." Perkins did not hear any fighting or commotion. Noting that Malone was "[a]rm distance" from Adams, Skates testified, "I seen them two talking back and forth. Mr. Adams took his right arm reaching out after he asked if the gun was loaded" just before being shot. Finally, although Malone testified Adams "was right at me" "in the intimate space" when he shot Adams eight times, Malone could not explain the lack of visible blood on his clothing.

One may use force against another "when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." TEX. PENAL CODE ANN. § 9.31 (West 2011). This includes using deadly force against the other if "the actor would be justified in using force against the other under Section 9.31," and "when and to the degree the actor reasonably believes the deadly force is immediately necessary" "to protect the actor against the other's use or attempted use of unlawful deadly force." TEX. PENAL CODE ANN. § 9.32(a) (West 2011). Because the *Jackson* standard is the only standard we apply, we examine the evidence in the light most favorable to the verdict.

Malone was the only eyewitness who testified that the shootings were an act of self-defense. Malone agreed on the stand that his statements asking officers whether he "had hurt

12

somebody" indicated lack of recollection. His blood-alcohol level, hours after the event, was .184. Pictures taken during Malone's booking and the testimony of officers who encountered Malone are inconsistent with Malone's claimed injuries from the alleged altercation. As the judge of credibility, the jury was free to discount Malone's testimony.

The jury was free to reject the theory of self-defense, even if it believed some or all of Malone's testimony. With respect to Gresham, Malone recalled, "I turned when I heard the footsteps coming up behind me . . .. I fired a shot. [Gresham] kept coming at me. I fired again. That's when he fell." The use of deadly force is justified only to protect the actor against another's use of deadly force. Malone's testimony that, "in his left hand [Gresham] had something . . .. I thought it was keys," established that Malone had time to observe Gresham and verify that he was not carrying a weapon. Even with the alleged statement by Gresham that he would kill Malone, which was made earlier, the jury could have found that Malone's testimony of the dive-tackle did not establish Gresham was using or attempting to use any deadly force. Therefore, because the jury could find Malone was not protecting himself from Gresham's "use or attempted use of unlawful deadly force," either because they disbelieved any altercation occurred between Gresham and Malone or because they did not find any use of deadly force by Gresham, the evidence was sufficient to reject Malone's self-defense theory. TEX. PENAL CODE ANN. § 9.32(a)(2)(A).

The evidence was sufficient to support the conviction.

13

*(2)*     *The Jury Charge Was Proper on the Two Self-Defense-Negating Issues of Provocation and Unlawfully Carrying a Weapon*

In accordance with Section 9.31(a)(2) and (3) and Section 9.32(b)(2) and (3) the jury was also instructed that a belief that deadly force was immediately necessary was reasonable unless they found (A) that Malone provoked Gresham or (B) that Malone was engaged in the unlawful carrying of a weapon at the time he shot Gresham.[6]

Malone argues that the trial court erred in submitting these instructions to the jury. Our review of alleged jury charge error involves a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994); *see also Sakil v. State*, 287 S.W.3d 23, 25–26 (Tex. Crim. App. 2009). Initially, we determine whether an error occurred, and then evaluate whether sufficient harm resulted from the error to require reversal. *Abdnor*, 871 S.W.2d at 731–32.

> A charge on provocation is required when there is sufficient evidence (1) that the defendant did some act or used some words which provoked the attack on him, (2) that such act or words were reasonably calculated to provoke the attack, and (3) that the act was done or the words were used for the purpose and with the intent that the defendant would have a pretext for inflicting harm upon the other.

*Smith v. State*, 965 S.W.2d 509, 513 (Tex. 1998). A provocation instruction should be submitted to the jury only "when there is evidence from which a rational jury could find every element of provocation beyond a reasonable doubt." *Id*. at 514. Our inquiry is whether "a rational jury could have found provocation beyond a reasonable doubt, viewing the evidence in the light most favorable to giving the instruction." *Id*.

---

[6]As described in detail below, the jury could have also rejected Malone's self-defense theory based on either a finding that Malone provoked Gresham or that Malone was unlawfully carrying a weapon.

14

During the charge conference, Malone's attorney objected:

[T]he State has failed to raise an issue of provocation. . .. Without sufficient evidence for the jury to find beyond a reasonable doubt that my client provoked anybody, the Court should not include as a requirement that the jury find "provoked" but should find as a matter of law that he did not provoke either of the victims.

While Malone did provide some evidence that he thought he was being attacked by Gresham, there was evidence from which the jury could find that Malone provoked Gresham. The first element is provocation in fact. The jury heard that Malone came to the front door with pistol in hand and used profanity in asking who was tampering with his motorcycle. There was testimony that Malone physically blocked Gresham from entering his own residence. Cockrell and Malone testified that an argument ensued between Malone and Adams. Malone testified that he shot Adams and then heard Gresham's footsteps coming toward him. "Usually the act or words which cause the attack will be leveled directly at the victim. However, acts or words directed at a third party may likewise provoke a difficulty." *Smith*, 965 S.W.2d at 514. The jury could find Malone's use of profanity, carrying a loaded gun at Gresham's girlfriend's home, being noticeably drunk, failing to put the gun away, arguing with Adams, and shooting Gresham's friend Adams were all acts of provocation.

The second element of provocation asks whether the defendant's acts or words were reasonably calculated to provoke the attack. "An act is reasonably calculated to cause an attack if it is reasonably capable of causing an attack, or if it has a reasonable tendency to cause an attack."

15

*Id.* at 517. In *Smith*, the victim intervened in an argument between the defendant and a third person, by brandishing a knife and warning the defendant not to speak to the third person. *Id.* The court noted that the evidence supported a conclusion that continued exchanges between the defendant and the third person "were likely to have a volatile effect on the victim such that the victim might, and probably would, have attacked appellant to make good on his warning." *Id.* The court found "the act of provocation in this case, the continued argument by the appellant with [the third person], could have been found by the jury under the circumstances to have been reasonably calculated to cause an attack by the victim." *Id.* at 518. Here, Malone testified Gresham fought with him and told him, "I'll kill you." Malone testified he fought with Adams after this statement. Malone was continuously asked before and during the alleged fight to put his gun away. His failure to put the gun down, his argument with Adams, and his shooting Adams could have been found by the jury under the circumstances to have been reasonably calculated to cause an attack by Gresham, given his earlier alleged threat.

The third element of the provocation doctrine involves the question of intent. *Id.* This element "is a matter of fact, to be determined from all of the circumstances." *Id.* In *Smith*, the court decided that evidence supporting the conclusion that the defendant continued to argue with a third person despite the victim's threat and request to stop was enough to raise the question of whether it could be the defendant's aim to "continue the argument to inspire the deceased to attack the appellant so that the appellant would have a pretext for killing the deceased." *Id.* at 519.

16

Here, Gresham's girlfriend was inside the house. Malone was reportedly drunk and irrational and was carrying a loaded deadly weapon which he appeared to be prepared to use. There was evidence that, despite repeated entreaties, Malone refused to put his weapon away at the door and physically blocked Gresham from entering the home to retrieve the motorcycle keys. He continued to argue and hold his weapon when inside the home, despite requests from Gresham and Adams, and the alleged threat made by Gresham. Even after shooting Adams, Malone still held onto his weapon. Knowing that Crystal was inside the home, along with the presence of other partygoers, whom Gresham could have felt the responsibility to protect, the question was raised, in the same posture as it was raised in *Smith*, as to Malone's intent in his continued refusal to yield the weapon.

The evidence was sufficient to raise the issue of provocation. Therefore, submission of the provocation instruction was not erroneous.

Next, pursuant to Section 46.02 of the Texas Penal Code, the court instructed the jury that unlawful carrying of a weapon

> is committed if a person intentionally, knowingly, or recklessly carries on or about his or her person a handgun if the person is not on the person's own premises or premises under the person's control, or inside of or directly en route to a motor vehicle that is owned by the person or under the person's control. You are instructed, however, that a person is not unlawfully carrying a weapon if the person is traveling.

It is undisputed that Malone was carrying a gun on Crystal's premises, not his own.[7]

---

[7]Malone did not have a concealed handgun license.

17

Malone objected to the inclusion of the court's instructions with respect to unlawful carrying of a weapon because he believed he was "still traveling as a matter of law." Yet, "[t]he question of whether one is a 'traveler' is a fact question to be resolved by the trier of fact." *Illingworth v. State*, 156 S.W.3d 662, 664 (Tex. App.—Fort Worth 2005, no pet.) (citing *Smith v. State*, 630 S.W.2d 948, 950 (Tex. Crim. App. 1982)). The Legislature has never defined what "traveling" means, and its precise meaning has been the subject of much debate. *Id.* at 664–65; *Ayesh v. State*, 734 S.W.2d 106, 108 (Tex. App.—Austin 1987, no pet.).

Malone believed that he established he was traveling since he travelled from another county—a distance of approximately eighty miles—to attend the party and was promised an overnight stay. Texas courts have generally distinguished "traveling" based on the distance and duration of the trip. *See Birch v. State*, 948 S.W.2d 880, 882 (Tex. App.—San Antonio 1997, no pet.); *Illingworth*, 156 S.W.3d at 665; *Ayesh*, 734 S.W.2d at 108; *Sanchez v. State*, 122 S.W.3d 347, 356 (Tex. App.—Texarkana 2003, pet. ref'd) (driving fifteen minutes between cities in different counties did not constitute traveling). "Some cases hold that once a traveler arrives at his destination and secures a room he is no longer a traveler." *Illingworth*, 156 S.W.3d at 665–66 (citing *Ballard v. State*, 167 S.W. 340 (Tex. Crim. App. 1914); *see Evers v. State*, 576 S.W.2d 46, 50 (Tex. Crim. App. 1978)). The evidence did not establish as a matter of law that Malone was travelling. Before the shootings, Malone had been shown to a room where he would stay

18

overnight, and his destination when he left his home had been the party.[8]   No evidence suggests

he had any further destination.   Therefore, the trial court did not err in submitting the unlawful

carrying of a weapon issue to the jury in the face of Malone's assertion that he was traveling.

We affirm the trial court's judgment.


                                            Josh R. Morriss, III
                                            Chief Justice


Date Submitted:        October 18, 2011
Date Decided:          November 3, 2011

Do Not Publish

---

[8]The State "is not required to introduce evidence controverting appellant's assertion of 'traveler' status"; here, the jury would have been free to find that Malone had arrived at his destination and was no longer traveling at the time of the offense.  *See Ayesh*, 734 S.W.2d at 108.